(No. 86-CC-2230– )

CALVIN MADISON, Claimant, *v.* THE STATE OF ILLINOIS,
Respondent.

*Opinion filed June 21, 1988.*

CALVIN MADISON, *pro se*, for Claimant.

NEIL F. HARTIGAN, Attorney General (MITCHELL
WILNEFF, Assistant Attorney General, of counsel), for Re-
spondent.

MONTANA, C.J.

This is a claim brought by Calvin Madison, a
resident of Stateville Correctional Center, for electrical
burns to his hands sustained on March 28, 1985, when he
inserted the plug of a tailoring machine into an outlet
and an explosion occurred.

At the time of the incident, Claimant was the
electrician and chief mechanic in the tailoring shop, and
had been so for approximately six months prior thereto.

On the day in question Merle Robinson, the
supervisor of the garment shop, ordered Claimant to
take a "butt" machine and interchange it with a surging
machine. At that time between 20 and 30 machines were
plugged in on a "line," that is to say, machines
approximately 12 inches off the floor, and with electrical
outlets (receptacles) spaced at intervals on the pipe.

Claimant switched the positions of the two machines as ordered, but when he inserted the plug of the "butt" machine into its receptacle on the line, there was an explosion and Claimant was burned.

While the extent of Claimant's injuries will be discussed later, it can be noted that the burns, especially to his right hand, were sufficient so that he was taken to the institution hospital.

A week after the accident, Claimant inspected the wiring in the line, and found that the wiring was rotten. He removed the plates from all of the receptacles on the line. As he testified:

"I took the plate off the receptacles that the plugs go into. And when you take the plate off them, you can see the wires. They are right there. They are right under there, coming through the pipe. And they were all rotten right down the line."

Claimant testified that he was hired by the tailor shop not as a mechanic but to re-wire the shop. But Robinson did not order the materials for Claimant to do the job. Claimant wanted to run the lines overhead, because the residents using the machines used the line as a foot rest, causing the sockets to come loose.

Claimant testified that before switching the two machines, he could have shut the power off in the line. But that would have shut down 20 machines on which people were working. He also testified that as far as he knew, no one had ever experienced any problems when plugging and unplugging the machines.

Claimant also denied that he had been instructed to turn off the line switch before plugging in or unplugging a machine.

"Q. Isn't it true, Mr. Madison, that you were instructed to turn off the line switch prior to plugging or unplugging the machine?

A. I was never asked to turn the power off to any line. The fact of the matter is I was told don't turn the power off because he was not going to stop his production. That was his main concern in the tailor shop."

He further testified that at the time of the explosion he was not holding a tool in his hand.

Respondent called Merle Robinson, the supervisor of the garment shop. Robinson testified that there are approximately 140 machines in the tailor shop with 20 to 30 machines on a line. He further testified that as a result of an incident at some unspecified time in the past, an explosion occurred when a mechanic holding a screw driver in his hand attempted to unplug a machine, he always instructed the mechanics to shut the power off before unplugging a machine.

"Q. Now, when you say they are told to turn the power off, you are talking about the line switch; is that the correct term?

A. The line switch. There is a switch there that turns off and on each line, see, and we've got a master switch that is locked up. That turns off the whole thing, see. But we leave it on and just turn off the line switch. Like if you happen to have a—If you want to work on the butt machine, you work on that line, you pull that switch."

Mr. Robinson could not remember whether he had told Claimant to switch the two machines.

"A. You know, I can't remember telling him to do that. I'm not going to deny that I did, but I can't remember. I really think in my own mind that I didn't but ° ° °"

He testified that he had talked to Claimant about re-wiring the shop for the purpose of expanding it and putting in more machines. When asked whether Claimant had ever told him prior to the incident that there was a problem with the wiring he replied,

"A. Not to my knowledge, No."

There is a direct conflict between the testimony of Claimant and that of Robinson as to whether Claimant had been instructed to shut off the power on the line before unplugging or plugging in machines. There is absolutely no evidence that Claimant was holding a screw driver or other metal tool in his hand when he plugged in the machine.

Claimant's testimony was that he was told *not* to turn off the power:

"A. I was never asked to turn the power off to any line. The fact of the matter is I was told don't turn the power off because he was not going to stop his production. That was his main concern in the tailor shop."

Claimant further rebutted Robinson's testimony when given an opportunity during rebuttal.

"A. Mr. Robinson told me 'Madison, I want you to take that butt machine. I want it over here on the raised line. I went [sic] that surge—I want you to put it over there in that corner over there.' I said okay.

I merely unplugged the butt machine. I unplugged the surge, moved the surge around where he wanted it, took the butt machine brought it around, plugged it in; and it blew up.

A. ° ° ° nobody was ever told not to turn the power off on line until after I was injured, after I was injured [sic]. Then he said from now on I want all the power turned off if you work on any machine if it is plugged into the line. You unplug it, take it to the side and work on it.

Q. Did Mr. Robinson before this incident ever tell you to turn off the line before you moved—

A. No, no.

Q. Did you ever hear him tell anyone else to shut off the line?

A. No."

Claimant's testimony is more credible than Robinson's somewhat vague, generalized testimony.

Respondent also called John McSweeney, the maintenance electrical foreman at Stateville. He had held that position for nine years and had been an electrician for 28 years.

McSweeney inspected the tailor shop the day before the hearing.

He gave expert testimony that even if the wiring in the receptacle was rotten, no flames would be able to come out because the metal cover over the receptacle would prevent them from doing so. He testified that the explosion was caused either by defects in the wires in the cord of the machine or in the three-pronged plug.

"A. You see that plug on the wall. A good example right here (Indicating). There is nothing—no way in the world you can make sparks if the wiring is even bad behind it. You cannot make sparks fly because that receptacle is supported by the cover.

If the wires were bare behind there, it still isn't going to spark. Something had to be either in the cord of the machine or the plug itself had to be going to ground caused the explosion, like he said. Because it won't—That plug won't move.

COMMISSIONER SIMPSON: Because your theory is that no matter how defective the wires were, the defective wiring would not cause in and of itself an explosion?

THE WITNESS: No, it can't come through the cover. See the cover around that receptacle right there (Indicating), it can't come through there. If the wiring itself is bad, it can't come through the cover. There's no way for it to get between the cover and the receptacle to burn your hand. It would short out in the pipe and trip the breaker.

COMMISSIONER SIMPSON: So your position is that—We know an explosion occurred. Your position is there was a defect either in the plug of the butt machine or in the wiring of the butt machine?

THE WITNESS: I would think so."

The foregoing testimony does not help Respondent.

The butt machine, its cord, its plug, the receptacle, the wiring in the receptacle, were the property of Respondent and were under the control of Respondent. Shifting the blame for the accident from the wiring in the receptacle to a defective plug simply reinforces Claimant's *prima facie* case of negligence.

"* * * Your position is there was a defect either in the plug of the butt machine or in the wiring of the butt machine?

THE WITNESS: I would think so."

Claimant offered some testimony as to the permanency of his injuries. But basically he has recovered from the painful burns he suffered in the incident.

"Q. Okay, For all practical purposes, you're not in any way affected in your ability to use your right hand?

A. No, I could use my right hand.

Q. So essentially what we're talking about is some temporary pain and suffering?

A. That's right."

Wherefore, it is hereby ordered that the Claimant, Calvin Madison, be and is hereby awarded the sum of $1,000.00.